**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 16 2002

JAMES W. McCORMACK, CLERK
By: _____ DEP CLERK

RECEIVED
**MAIL ROOM**

DEC 16 2002

U.S. DISTRICT COURT
E. DIST. OF ARKANSAS

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## BATESVILLE DIVISION

THOMAS ERNST, a.k.a. THOMAS AKYAR                    **PLAINTIFF**

VS.                                    CASE NO. 1-02-CV-00060 SWW

LIFE PLUS INTERNATIONAL                              **DEFENDANT**

### BRIEF IN OPPOSITION TO MOTION TO DISMISS

Plaintiff respectfully submits this brief in opposition to Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6).

### STATEMENT OF THE CASE

Plaintiff Thomas Ernst, a.k.a. Thomas Akyar, is an individual citizen of Germany and an adherent to the religion of Scientology. First Amended Complaint ¶3. Defendant Life Plus International ("Life Plus") is an Arkansas general partnership that sells vitamins and related products. First Amended Complaint ¶¶ 4-5. Defendant markets its products using "multilevel" or "network" marketing practices. Pursuant to these practices, a marketing agent for Defendant may earn income in either of two ways: (1) through commissions from persuading consumers to purchase Defendant's products; or (2) through recruiting additional marketing agents, and then receiving a portion of the commissions earned by those recruits, as well as a portion of the commissions earned by further "downline" agents, *i.e.* agents recruited by the original agent's recruits. First Amended Complaint ¶6.



In October 1996, while residing in Turkey, Plaintiff began working as a marketing agent for Defendant. Ernst Dec. ¶3.[1] Critically, Plaintiff did not, as Defendant wrongly asserts, contract first with Life Plus Europe Ltd. ("Life Plus Europe").[2] Rather, as explained more fully below, Plaintiff originally became involved in the Life Plus organization in 1996 by forming a contractual relationship directly with Defendant. It is Defendant's subsequent termination of this contractual relationship on the basis of Plaintiff's religion that is the subject of this litigation.

Prior to his termination, Plaintiff was highly successful at marketing Defendant's products and at recruiting additional marketing agents for Defendant. First Amended Complaint ¶8. In recognition of Plaintiff's superlative performance and fidelity to the policies and procedures of Life Plus, Plaintiff was offered membership in Defendant's "Diamond Bonus" program, a position reserved for high achievers in the Life Plus organization. On or about February 4, 2000, Plaintiff and Defendant executed a written Diamond Bonus agreement governing the terms of their working relationship under the Diamond Bonus program. First Amended Complaint ¶¶9-10.

In June 2001, an article appeared in *Network Press*, a German trade journal, describing Plaintiff's successful career as a Life Plus marketing agent. The article identified Plaintiff by name and featured a picture of Plaintiff with the caption "Successful Scientologist." The article did not otherwise mention or refer to the Scientology religion or to Plaintiff's belief in and adherence to Scientology. First

---

[1] In the First Amended Complaint, Plaintiff mistakenly alleged that Plaintiff began working for Defendant in 1995, rather than in 1996. *See* First Amended Complaint ¶7. Plaintiff regrets any inconvenience caused by the error.

[2] Plaintiff alleges that regarding the matters alleged in the First Amended Complaint, Life Plus Europe has acted as an agent or alter-ego of Defendant. *See* First Amended Complaint ¶20. Defendant denies the allegation.

Amended Complaint ¶18.  Shortly thereafter, Plaintiff received a letter dated July 2, 2001, from Life Plus Europe observing that Plaintiff had been publicly identified as a "practicing Scientologist," and stating that "membership in the Church of Scientology cannot be accepted by the great majority."  On this basis, the July 2 letter purported to terminate a contract between Plaintiff and Life Plus Europe.  First Amended Complaint ¶19.  Defendant has acted and continues to act as if the July 2 letter terminated Plaintiff's contractual relationship with Defendant.  First Amended Complaint ¶20.

On July 1, 2002, Plaintiff filed this diversity action, alleging that Plaintiff's termination because of his religion was in violation of the Arkansas Civil Rights Act of 1993, Ark. Code Ann. §§ 16-123-101 *et seq.*  On August 20, 2002, Defendant moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1).  On October 2, 2002, Plaintiff filed an opposition to Defendant's motion to dismiss, as well as a First Amended Complaint which, pursuant to Fed. R. Civ. P. 15(a), added causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing.  The parties have agreed that Defendant's motion to dismiss the original complaint is now moot.  On November 4, 2002, Defendant filed the instant motion to dismiss the First Cause of Action in the First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1), and to dismiss all three causes of action in the First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## ARGUMENT

I.    **THE COURT HAS SUBJECT-MATTER JURISDICTION OVER THIS MATTER BECAUSE THERE IS AN ACTUAL CASE OR CONTROVERSY, THE PARTIES ARE COMPLETELY DIVERSE, AND THE AMOUNT IN CONTROVERSY EXCEEDS $75,000 EXCLUSIVE OF INTEREST AND COSTS**

## A.     Every Requirement for Subject-Matter Jurisdiction Is Satisfied

"Life Plus moves to dismiss the First Cause of Action in the First Amended Complaint because," according to Life Plus, "this Court lacks subject matter jurisdiction to adjudicate that claim." Defendant's Brief in Support of Motion to Dismiss at 4 (hereinafter cited as "D. Br. at __"). Yet Life Plus disputes none of the facts, clearly alleged in the First Amended Complaint, that establish the Court's diversity jurisdiction and that demonstrate Plaintiff's standing to bring this litigation.

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2). Plaintiff has alleged each of the necessary elements. *See* First Amended Complaint ¶2. Defendant does not dispute them. The Court therefore has subject-matter jurisdiction pursuant to the alienage diversity statute. *See JP Morgan Chase Bank v. Traffic Stream (BVI) Infrastructure, Ltd.*, 122 S. Ct. 2054, 2056-58 (2002).

Without explanation or support, Defendant contends that Plaintiff lacks standing under Article III of the United States Constitution. Yet, as the Supreme Court has explained, "the irreducible constitutional minimum of standing contains three requirements": (1) the plaintiff has suffered injury in fact; (2) the injury was caused by defendant's alleged wrongdoing; and (3) the injury would likely be redressed by an appropriate order from the court. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102-03 (1998). All three requirements are plainly satisfied here.

In short, then, the Court has diversity jurisdiction over this controversy, and jurisdiction is not destroyed by an absence of standing. Defendant's motion to dismiss

the First Cause of Action in the First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) must therefore be rejected.

The substance of Defendant's jurisdictional challenge is that Arkansas law, as interpreted by Defendant, permits discrimination on the basis of religion where the injured party is not a citizen of Arkansas.  *See* D. Br. at 8-13.  On Defendant's view, then, the Court's jurisdiction to adjudicate this matter turns on a particular construction of the Arkansas Civil Rights Act.  Even supposing, counterfactually, that Defendant's interpretation of Arkansas law were correct, a recent unanimous decision from the United States Supreme Court decisively rejects Defendant's jurisdictional theory:

> It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the court's statutory or constitutional *power* to adjudicate the case.  As we have said, the district court has jurisdiction if the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws . . . are given one construction and will be defeated if they are given another, unless the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.

*Verizon Maryland Inc. v. Pub. Serv. Comm.*, 122 S. Ct. 1753, 1758-59 (2002) (internal quotation marks and citations omitted); *see also Steel Co.*, 523 U.S. at 89 (""[j]urisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover.'") (quoting *Bell v. Hood,* 327 U.S. 678, 682 (1946)); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350, p. 196 & n.8 (2d ed. 1990).

## B.  Plaintiff Is Protected by the Arkansas Civil Rights Act Against Intentional Discrimination Carried Out in Arkansas

In any event, the Court should reject Defendant's contention that Arkansas law permits intentional discrimination carried out in Arkansas against out-of-state parties, the

statutory construction on which Defendant's jurisdictional argument is premised. The Arkansas Civil Rights Act of 1993 makes it unlawful to discriminate against "an otherwise qualified person" on the basis of religion in respect of contractual transactions. Ark. Code Ann. § 16-123-107(a), (a)(4). The statute further provides that "[a]ny person who is injured by an intentional act of discrimination in violation of [this provision] shall have a civil action in a court of competent jurisdiction to enjoin further violations, to recover compensatory and punitive damages, and, in the discretion of the court, to recover the cost of litigation and a reasonable attorney's fee." Ark. Code Ann. § 16-123-107(b). The question, then, is whether Plaintiff is "any person" within the meaning of the Akransas statute.

Neither the Arkansas Act nor any Arkansas cases define the term "person" or "otherwise qualified person" for purposes of the civil rights statute. There is, in other words, no authority stating that the term "person" should be read as if "citizen" were there in its place, nor indeed that "person" should have any meaning other than the ordinary sense of that term.[3] "In the absence of an indication to the contrary, words in a statute are assumed to bear their ordinary, contemporary, common meaning." *National Railroad Passenger Corp. v. Morgan*, 122 S. Ct. 2061, 2070 (2002).

---

[3]  To support its contention that "person" should be interpreted to mean "Arkansas citizen," Defendant points to *Flentje v. First Nat. Bank of Wynne*, 11 S.W.3d 531 (Ark. 2000), in which the Arkansas Supreme Court observed in dicta that the statute "provides citizens of this state legal redress for civil rights violations." *Id.* at 536. Although the decision is not explicit, it appears that both parties in *Flentje* were Arkansas citizens, so the Court had no occasion to rule on whether a non-citizen is a "person" within the meaning of the statute. Even if it had so ruled, *Flentje* would be inapposite here. Unlike the instant case concerning discrimination in *contractual* transactions, *Flentje* involved a question of *employment* discrimination, a class of civil rights actions the Arkansas legislature has *expressly* made available only to plaintiffs who are Arkansas citizens. *See* Ark. Code Ann. § 16-123-102(4)(C). No analogous provision bars claims of contractual discrimination brought by foreign plaintiffs.

With no authority for the proposition that Plaintiff is not a "person" within the meaning of the Arkansas Civil Rights Act, Defendant relies on the definition of a different statutory term, one not at issue in this litigation. Because the Act expressly defines "employee" to exclude "[a]n individual employed outside the State of Arkansas," Defendant argues, the legislature must have intended to define "person" to mean only "citizen." *See* D. Mem. at 7-8; Ark. Code Ann. § 16-123-102(4)(C). This is a specious method of statutory interpretation. In truth, the statute's explicit limitation of one type of civil rights action to Arkansas plaintiffs shows clearly that the legislature did not intend that the remaining civil rights claims should be subject to the same limitation.

"Where [a legislature] includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Here, the legislature has expressly limited the class of plaintiffs who may sue under the Act for employment discrimination to persons employed within the State of Arkansas. The legislature could just as easily have included similar language limiting the class of persons who could sue for discrimination in contexts other than employment, such as the contractual context relevant here. Yet the Act contains no such limitation.[4]

---

[4]      Defendant thinks it implausible that the Arkansas legislature would have provided more robust protection against discrimination to independent contractors than to employees. But the Arkansas Civil Rights Act undeniably contains restrictions on employment-discrimination actions that are not applicable to actions for contractual discrimination. For example, the statute imposes a one-year statute of limitations for employment-discrimination claims, but does not do so for claims of contractual discrimination. *See* Ark. Code Ann. §§ 16-123-101(c)(3). The Act further sets out express caps on the amount of compensatory and punitive damages recoverable for employment discrimination, but sets no limits on damages for contractual discrimination. *See* Ark. Code Ann. §§ 16-123-101(c)(2).

Defendant's reliance on *Widmer v. Wood*, 420 S.W.2d 828 (Ark. 1967), is also misplaced. *Widmer* concerned a claim brought under an Arkansas statute alleging injury to land located in the State of Oklahoma. Rejecting the claim, the court commented that "[o]rdinarily, statutes have no effect except within the state's own territorial limits," and noted that this "principle is peculiarly applicable to injuries to land, which are governed by the law of the place where the land is." *Id.* at 830. Unlike in *Widmer*, Plaintiff here does not ask the Court to apply an Arkansas statute to wrongful conduct occurring wholly in another State, concerning land or indeed any subject matter located wholly in another State. Defendant was in Arkansas when it terminated its contract with Plaintiff because of Plaintiff's religion. Defendant was likewise in Arkansas in 1996 when it entered into the contract at issue, and remained in Arkansas during the intervening period in which Defendant performed obligations under the contract.[5]

Not only does Defendant fail to account for these crucial facts, Defendant incorrectly states that the contractual relationship at issue here was between Plaintiff and Life Plus Europe, which Defendant claims is a separate entity from Life Plus – and astonishingly, without explanation, Defendant even attributes this position to Plaintiff. *See* D. Br. at 12 ("As Plaintiff admits in his First Amended Complaint . . ."); *see also* D. Br. at 2, 3 (citing the First Amended Complaint for the proposition that Plaintiff contracted with Life Plus Europe). The basis for this attribution is utterly mysterious since the First Amended Complaint, in the very paragraph cited by Defendant, plainly

---

[5]     Also without merit is Defendant's reliance on federal cases concerning the interpretation of federal legislation. Those cases, driven by the uniquely federal concern of international comity, reveal nothing about the Arkansas legislature's intent to eradicate discrimination in contracts originating in Arkansas, and performed in Arkansas, such as the contract at issue here.

states that "Plaintiff began working as a marketing agent *for Defendant . . . ."* First Amended Complaint ¶7 (emphasis added).

To dispel the confusion created by Defendant's false representations regarding the role of Life Plus Europe in the events at issue in this litigation, Plaintiff has attached to this brief a declaration, with appended exhibits, describing how Plaintiff first contracted with Life Plus and relating some of the circumstances of the contractual relationship.[6] As stated in the declaration, while living in Turkey in October 1996 – *before Life Plus Europe even existed* – Plaintiff spoke by telephone with Defendant, and both parties agreed that Plaintiff would work as a marketing agent for Defendant, and would receive compensation according to Defendant's network marketing practices. Ernst Dec. ¶3. Defendant assigned to Plaintiff a unique Life Plus personal identification number, which remained his company number until he was terminated. Ernst Dec. ¶3. Plaintiff's first order of Life Plus products was shipped to him directly from the United States. Ernst Dec. ¶4. Plaintiff was informed, however, that Life Plus intended to open a branch office in Europe in order to facilitate distribution of products overseas. Ernst Dec. ¶4.

In December 1996, Plaintiff read about the opening of the London-based Life Plus Europe in the publication "Members Monthly," a newsletter written and distributed by Defendant. Ernst Dec. ¶4. The newsletter, which is appended as Exhibit A to the Ernst declaration, states: "Our dream of the sun never setting on your Life Plus business became a reality on November 4, 1996 with the opening of Life Plus Europe, Ltd. With offices in the United States, Canada, Australia and England: Life Plus now has a major global presence." Ernst Dec. Ex. A. The newsletter further states: "The Life Plus

---

[6]      The declaration is cited herein as "Ernst Dec. ¶__," or "Ernst Dec. Ex. __," as appropriate.

network is a seamless global network." Ernst Dec. Ex. A. It continues: "*Our new office* located in England is linked with direct computer lines to *the home office* in Batesville." Ernst Dec. Ex. A (emphasis added).

After the opening of Life Plus Europe, Plaintiff was able to fill orders for Life Plus products from either the branch office in London or the home office in Arkansas. Ernst Dec. ¶5. Also after the opening of Life Plus Europe, Plaintiff received commissions for marketing Life Plus products that were calculated at Life Plus' Arkansas headquarters. Ernst Dec. ¶5. In addition, Plaintiff received regular accounting statements from the Life Plus home office in Arkansas, even after the opening of the Life Plus Europe office. Ernst Dec. ¶5. Plaintiff has appended as Exhibit B to his declaration a copy of a check he received from Life Plus in 1999, which is denominated in United States dollars and signed by Timothy Nolan, one of the founders of Life Plus;[7] a true and correct copy of an accounting statement for January 1998, reflecting payments denominated in United States dollars; and a true and correct copy of an accounting statement for June 2001, reflecting payments denominated in euros, along with a copy of the statement's packaging materials showing that the statement was sent from Batesville, Arkansas.

In spite of the foregoing, Defendant rests its challenge to the Court's subject-matter jurisdiction on the claim that Plaintiff's contractual role as a Life Plus marketing agent had "no material connection" to the State of Arkansas. D. Br. at 12. Defendant freely concedes, however, that the Diamond Bonus agreement between Plaintiff and Defendant "is connected with Arkansas." D. Br. at 12; *see also* D. Br. at 19. But

Plaintiff's original contract to work as a Life Plus marketing agent has at least as much of a connection to Arkansas as does the Diamond Bonus agreement. Defendant was in Arkansas in 1996 when it first entered into the contract with Plaintiff; Defendant remained in Arkansas as it performed its obligations under the contract; and it was from Arkansas that Defendant terminated the contract because of Plaintiff's religion.

It is further significant that Exhibit B to Plaintiff's declaration reflects payments from Defendant to Plaintiff in 1999 and 1998, prior to the parties' 2000 execution of the Diamond Bonus agreement. These payments are flatly inconsistent with Defendant's position, on which the instant motion depends, that the Diamond Bonus agreement was the only contract between Plaintiff and Defendant.

Moreover, as the First Amended Complaint indicates, the Diamond Bonus agreement itself explicitly acknowledges the pre-existing contract between Plaintiff and Defendant: "'[Y]ou continue to be an independent contractor of Life Plus International.'" First Amended Complaint ¶15 (quoting Diamond Bonus agreement). Thus, Defendant has already conceded the existence of the contract it now scrambles to deny.

Finally, it is noteworthy that Defendant raises no jurisdictional challenge to the second and third causes of action asserted in the First Amended Complaint. Thus, even if the Court were to agree with Defendant that there is no subject-matter jurisdiction over the first cause of action, the Court would continue to have jurisdiction over the remaining claims for relief.

## II.    EACH CAUSE OF ACTION IN THE FIRST AMENDED COMPLAINT STATES A CLAIM FOR WHICH RELIEF CAN BE GRANTED

---

[7]    Plaintiff's member name in the Life Plus organization was "Leaders Plus International;" the check is made out accordingly.

### A.    Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) Asserts Facts Contrary to the Allegations in the First Amended Complaint

While paying lip-service to the rule that courts resolving Rule 12(b)(6) motions "'accept the plaintiff's factual allegations as true,'" Defendant premises its motion on factual claims that are inconsistent with those advanced by Plaintiff.   D. Br. at 5 (citing *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997)).   Moreover, Defendant continues to attribute allegations to Plaintiff that contradict the allegations in the First Amended Complaint.   For example, after accusing Plaintiff of "deliberate vagueness," Defendant offers the putative clarification: "Plaintiff alleges that the LP Europe contract was terminated because of Plaintiff's religious affiliation. . . .   Plaintiff thus purports to allege 'termination because of religion' only with respect to the LP Europe contract . . . ."   D. Br. at 18.   But the First Amended Complaint contains no vagueness, deliberate or otherwise, regarding the parties to the original contract, later terminated because of Plaintiff's religion:  "Plaintiff began working as a marketing agent *for Defendant* . . . ."  First Amended Complaint ¶7 (emphasis added).

Nothing in the First Amended Complaint even remotely suggests that Plaintiff originally contracted with Life Plus Europe to market Life Plus products.   Defendant cuts this allegation from whole cloth, imputes it to Plaintiff, and then makes it the centerpiece of a dismissal motion that purportedly accepts Plaintiff's allegations as true.   The Court, however, must decide the Rule 12(b)(6) motion assuming the truth of allegations that actually appear in the First Amended Complaint, not those that appear solely through Defendant's ventriloquisms.   Accordingly, the Court must ignore Defendant's oft-repeated assertion that the contract wrongfully terminated was between Plaintiff and Life

Plus Europe, not between Plaintiff and Defendant, along with all inferences that flow from that assertion.[8]

The upshot is that Defendant's Rule 12(b)(6) motion must be rejected in its entirety, since each of Defendant's arguments in favor of dismissal proceeds from the faulty premise that Plaintiff and Defendant never entered into a contract for Plaintiff to market Life Plus products. Thus, Defendant's lengthy argument regarding agency and alter-ego status is predicated on the claim, which the Court must reject, that "Plaintiff's 'alter-ego' assertion is the only thread connecting Life Plus to the matters complained of." D. Br. at 13.

Likewise, Defendant's choice-of-law analysis is based on the bogus assertion that the unlawfully terminated contract has no connection to the State of Arkansas. Defendant claims that "the only Arkansas contact in this case relates to Plaintiff's Diamond Bonus membership," and proceeds to argue that this contact will not support the application of Arkansas law "[b]ecause Plaintiff's Diamond Bonus membership was ancillary to his German contract with LP Europe." D. Br. 19. As noted, however, Defendant is an Arkansas general partnership that was in Arkansas when it negotiated and contracted with

---

[8]    More specifically, the Court must reject the following claims and all arguments that depend on them: "Plaintiff's 'alter-ego' assertion is the only thread connecting Life Plus to the matters complained of . . . ;" D. Br. at 13; "'The most significant relationship' in this case is . . . with Germany, where Plaintiff contracted with LP Europe and where LP Europe terminated Plaintiff's contract;" D. Br. at 14; "Plaintiff's action is entirely premised on his conclusory allegation that the acts of LP Europe are attributable to Life Plus;" D. Br. at 16; "The 'contractual relationship' that is the basis of Plaintiff's claims was formed, performed, and terminated in Germany, not in Arkansas;" D. Br. at 17; "Plaintiff thus purports to allege 'termination because of religion' only with respect to the LP Europe contract . . . ;" D. Br. at 18; "The only Arkansas contact in this case relates to Plaintiff's Diamond Bonus agreement . . . ;" D. Br. at 19; "Plaintiff's Diamond Bonus membership was ancillary to his German contract with LP Europe . . . ;" D. Br. at 19; "Plaintiff's authority to sell Life Plus® Products came only from his agreement with LP Europe . . . ." D. Br. at 19.

Plaintiff, when it performed under the contract, and when it terminated the contract because of Plaintiff's religion. The Diamond Bonus agreement, which Defendant concedes "is connected to Arkansas," is not ancillary to an underlying contract with Life Plus Europe, as Defendant asserts, but rather modifies or supplements the prior contract between Plaintiff and Defendant.

Further, Defendant's choice-of-law analysis overstates Plaintiff's connection to Germany with regard to the events at issue in this litigation, once again asserting facts not found in the First Amended Complaint. Thus, Defendant contends that Plaintiff "has at all times been a citizen and resident of Germany," and that "[i]t was in Germany that he agreed to become an independent contractor for LP Europe . . . ." D. Br. at 18. Not so. Plaintiff is a German citizen, *see* First Amended Complaint ¶3, but he resided in Turkey, not Germany, in 1996 when he became a marketing agent for Life Plus products. And, of course, Plaintiff's contract was not with Life Plus Europe but with Defendant.

### B.    The Agency or Alter-Ego Relationship Between Life Plus and Life Plus Europe Is Adequately Pled in the First Amended Complaint

In any event, there is no pleading defect in Plaintiff's allegation that Life Plus Europe acted as Defendant's agent or alter-ego regarding the matters alleged in the First Amended Complaint. To begin with, Defendant falsely represents that the existence of an agency relationship is a "legal conclusion." D. Br. 15. In truth, under Arkansas law "agency is a question of fact ordinarily determined by the trier of fact." *Howard v. Dallas Morning News, Inc.*, 918 S.W.2d 178, 185 (Ark. 1996).

Moreover, Defendant incorrectly asserts that the "First Amended Complaint is devoid of any factual allegation that even hints that LP Europe is authorized to act on behalf of Life Plus." D. Br. at 15. To the contrary, the First Amended Complaint alleges:

"Plaintiff began working as a marketing agent for Defendant . . . .    In a letter to Plaintiff dated July 2, 2001, Life Plus Europe . . . terminated or purported to terminate Plaintiff's contractual relationship with Life Plus Europe. . . .    Defendant has accepted and adopted the purported termination of Plaintiff by Life Plus Europe, and has acted as if the effect of the July 2 letter was to terminate the contractual relationship between Plaintiff and Defendant." First Amended Complaint ¶¶ 7, 19, 20.

These allegations, conveniently ignored by Defendant, are easily sufficient to satisfy the notice pleading requirements of Fed. R. Civ. P. 8(a).  As the Eighth Circuit recently explained, "Rule 8(a) did away with the necessity of detailed fact pleading." *Gardner v. First American Title Ins. Co.*, 294 F.3d 991, 994 (8th Cir. 2002).  The rule requires that a complaint include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also* Fed. R. Civ. P. 8(e)(1) ("No technical forms of pleading or motions are required.").  "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).  Accordingly, to comply with Rule 8(a) a complaint need only give the defendant "fair notice of the basis for [the plaintiff's] claims." *Id.* at 514.

Even if the First Amended Complaint had never mentioned the words "agent" or "alter-ego," Defendant would still be on fair notice that it may be held liable for "accept[ing] and adopt[ing]" Life Plus Europe's purported termination of Plaintiff, and "act[ing] as if" Life Plus Europe had "terminate[d] the contractual relationship between Plaintiff and Defendant." First Amended Complaint ¶20.  The First Amended Complaint

therefore easily satisfies the requirements of Rule 8(a).  *See Swierkiewicz*, 534 U.S. at 512.

Discovery will reveal the precise circumstances under which Life Plus Europe acted on behalf of Defendant – whether through prior arrangement, subsequent adoption, or because Life Plus Europe is in fact simply an alter-ego of Defendant.  Whatever these circumstances may be, however, they need not have been specifically pled in the First Amended Complaint.

**B.      Scientology is Recognized as a Religion in the United States and Germany**

Defendant contends that "[u]nder German law, Scientology is not a religion, but is instead a business association."  D. Br. at 20.  This statement is both incorrect and irrelevant to the present proceedings.  Notwithstanding the dicta from the single German court decision cited by Defendant, numerous courts in Germany have recognized Scientology's status as a religion.  Attached to this brief is the Declaration of Kendrick L. Moxon, which appends as Exhibit A examples of four such decisions, along with English translations.

While these decisions clearly demonstrate the falsity of Defendant's assertion, Scientology's status as a recognized religion in Germany is not pertinent to the instant motion.  The First Amended Complaint pleads no cause of action under German law.  Accordingly, Defendant's argument that the First Amended Complaint should be dismissed because it fails to state a claim under German law is simply a red herring.

The First Amended Complaint asserts claims for relief under the laws of Arkansas.  Many courts in the United States have recognized Scientology as a religion and Scientology's beliefs and practices as religious in nature.  See *Hernandez v. C.I.R.,*

490 U.S. 680, 684-85 (1989); *Church of Scientology Flag Service Organization, Inc. v. City of Clearwater*, 2 F.3d 1514, 1519-20 (11th Cir. 1994); *Founding Church of Scientology of Washington, D.C. v. United States*, 409 F.2d 1146, 1160 (D.C. Cir. 1969); *Church of Scientology Flag Service Organization v. Williams*, 671 So.2d 840 (Fla. 5th DCA 1996).

### III.    DEFENDANT HAS NOT SATISFIED ITS BURDEN OF DEMONSTRATING FACTS SUFFICIENT TO SUPPORT DISMISSAL ON GROUNDS OF *FORUM NON CONVENIENS*

As a last resort, Defendant urges the Court to dismiss the First Amended Complaint on grounds of *forum non conveniens*. Under the *forum non conveniens* doctrine, "when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience, or when the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems, the court may, in the exercise of its sound discretion, dismiss the case." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981) (internal quotation marks omitted).

In resolving motions to dismiss on grounds of *forum non conveniens*, a plaintiff's choice of forum is owed deference by the court; "less deference" is applicable where, as here, the plaintiff is foreign. *Id.* at 255-56. "Additionally, the plaintiff is normally master to decide what law he will rely upon." *BASF Corp. v. Symington*, 50 F.3d 555, 557 (8th Cir. 1995) (internal quotation marks omitted). "The defendant has the burden of persuasion in proving all elements necessary for the court to dismiss a claim based on *forum non conveniens*." *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1390 (8th Cir. 1995).

Defendant has come a long way from satisfying its burden here. To begin with, Defendant has not expressly made itself amenable to process in Germany nor waived any objections it may have to an assertion of personal jurisdiction over it by a German court. Defendant therefore has not met the threshold requirement of demonstrating that Germany is a suitable alternative forum, so dismissal under the *forum non conveniens* doctrine is not available. *See Piper Aircraft Co.*, 454 U.S. at 254 n.22.

Nor has Defendant demonstrated that trying this case in a German forum would favorably affect "the convenience of the parties and the ends of justice," the touchstone of the *forum non conveniens* analysis. *Koster v. Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 527 (1947). Defendant takes the highly unusual step of requesting dismissal from its own home district. Dismissal on grounds of *forum non conveniens* from the forum where Defendant resides is available only in extremely rare circumstances. *See Reid-Walen v. Hansen*, 933 F.2d 1390, 1395 (8th Cir. 1991) ("A significant factor in this case is that the defendants are U.S. citizens and the action was transferred to their home district . . . . In this unusual situation, where the forum resident seeks dismissal, this fact should weigh strongly against dismissal."); *see also Manu Int'l, S.A. v. Avon Products, Inc.*, 641 F.2d 62, 67 (2d Cir. 1981).

Moreover, Defendant once again rests its argument in favor of dismissal on the false premise that Plaintiff and Defendant never had a contract for Plaintiff to market Life Plus products. Thus, Defendant contends that the "private interest factors" identified in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947) favor dismissal because "in Arkansas there are no material witnesses to the formation, performance or termination of the LP Europe contract," and "LP Europe . . . is not amenable to process in Arkansas."

D. Br. at 25. But Life Plus Europe is a tangential player in this litigation, relevant only because Defendant either instructed it to terminate Plaintiff's contract with Defendant, or subsequently adopted Life Plus Europe's purported termination of Plaintiff.

In truth, the private interest factors weigh in favor of an Arkansas forum. Proof of Plaintiff's claims will be made out by evidence of Defendant's conduct – conduct that occurred entirely within the State of Arkansas. Thus, Arkansas is the most convenient forum to access evidence necessary to establish Plaintiff's claims for relief. The applicable public interest factors favor an Arkansas forum as well. Arkansas plainly has an interest in ensuring that a general partnership existing under the laws of Arkansas and doing business from Arkansas complies with the laws and public policy of the State. Germany, in contrast, has a far weaker connection. Neither Plaintiff nor Defendant was in Germany at the time the underlying contract was formed.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendant's motion to dismiss in its entirety.

Respectfully submitted,

By _Kendrick L. Moxon / GS_
Kendrick L. Moxon
**MOXON & KOBRIN**
3055 Wilshire Blvd., Ste. 900
Los Angeles, CA 90010
(213) 487-4468 - phone
(213) 487-5385 – fax

Spencer F. Robinson 77111
**RAMSAY, BRIDGFORTH, HARRELSON**
**& STARLING LLP**
P.O. Box 8509
Pine Bluff, AR 71611-8509
(870) 535-9000 – phone
(870) 535-8544 – fax

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Kendrick L. Moxon, attorney for the Plaintiff herein, do hereby certify that I have served a true and correct copy of the foregoing Brief in Opposition to Motion to Dismiss on the following individuals by first class mail, postage prepaid, this 13th day of December, 2002:

Mr. John P. Gill
Gill, Elrod, Ragon, Owen & Sherman, P.A.
425 West Capitol Avenue, Suite 3801
Little Rock, AR 72201

Mr. Stephen Fedo
Neal, Gerber & Eisenberg
2 North LaSalle Street
Chicago, IL 60602

Ms. Joann Underwood, P.A.
267 E. Main Street
Batesville, AR 72501

Kendrick L. Moxon

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS

*Exhibits Attached to Original Document in Court's Case File*